## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

SCOTT HILDRETH,             )
                                  )
         **Plaintiff,**        )
                                  )
**vs.**                            )     **Case No. 3:15-CV-00831-NJR-DGW**
                                  )
**KIM BUTLER, LORI OAKLEY, and** )
**WEXFORD HEALTH SOURCES, INC.,** )
                                  )
         **Defendants.**     )

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter comes before the Court on the Report and Recommendation of Magistrate Judge Donald G. Wilkerson, which recommends denying the Motion for Summary Judgment filed by Defendant Wexford Health Sources, Inc.[1] ("Wexford") (Doc. 79) and the Motion for Summary Judgment filed by Defendants Kim Butler and Lori Oakley (Doc. 82). For the following reasons, the Court respectfully rejects the Report and Recommendation and grants both motions.

### INTRODUCTION

Plaintiff Scott Hildreth, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Menard Correctional Center, filed this civil rights lawsuit pursuant to 42 U.S.C. § 1983 complaining Defendants violated his constitutional rights. Hildreth is proceeding on two claims. First, Hildreth claims Defendant Butler, the former Assistant Warden and Americans with Disabilities Act ("ADA") Coordinator at Menard, and

---

[1] The Clerk's Office is **DIRECTED** to correct Defendant's name on the docket sheet. Furthermore, pursuant to the Court's Order of June 16, 2017, Defendants Marvin Bochantin, Dawn Marcinkowska, and David Dwight were dismissed without prejudice (Doc. 65). Finally, Defendants Jane Doe and Lieutenant John Doe were never identified. Accordingly, the Clerk's Office is **DIRECTED** to terminate these Defendants as parties to this matter.

Defendant Oakley, a Grievance Officer, discriminated against him and denied him reasonable accommodations for his Parkinson's disease. Specifically, he claims Defendants denied him access to a typewriter or word processor and/or access to the prison law library, in violation of the ADA (Doc. 26). Second, Hildreth claims Defendant Wexford maintains unconstitutional policies, practices, and customs of intentionally not refilling its stock of Parkinson's medicine such that Hildreth's prescriptions can be refilled in a timely manner (*Id.*). Hildreth alleges his prescription medication has run out multiple times and has not been refilled within a reasonable amount of time, thus causing him to suffer relapses and withdrawal symptoms (Doc. 26). Hildreth claims this practice is motivated by Wexford's deliberate indifference to his and other inmates' medical needs, which are placed at a lower priority than Wexford's business interests and profits (*Id.*).

## BACKGROUND

Hildreth was diagnosed with Parkinson's disease in 1996 (Doc. 83-1, p. 18). The disease causes Hildreth to lose his balance, slide out of his chair, and move uncontrollably (*Id.*, pp. 21-22). It also affects his handwriting and causes him to "shuffle" when walking or to freeze up and fall over (*Id.*).

Because his handwriting is shaky, Hildreth purchased a typewriter to keep in his cell in order to write court documents and other correspondence. In 2012, the prison confiscated his typewriter because it was considered contraband (*Id.*, pp. 38-39). Hildreth filed a grievance in July 2012 and sought a permit allowing him to possess the typewriter and/or a word processor (*Id.*, p. 143). Grievance Officer Oakley found the grievance moot, stating the issue was discussed with the prison's ADA Coordinators, Assistant Warden Butler, Assistant A. Grott, the Healthcare Unit, and the Warden, and it was determined that the

typewriter would not be returned to Hildreth (*Id.*, pp. 40, 50, 143). He would, however, be placed on the automatic call line to the law library when he was 90 days out from a court deadline, he could contact an officer in emergency situations, and a counselor would be making increased contact to assist him (*Id.*).

Hildreth testified that the counselor did make increased contact with him, and Defendant Butler gave him three days a week in the law library from 8 a.m. to 2 p.m. to use the typewriter (*Id.*, p. 42). On October 30, 2014, Hildreth filed another grievance stating that he needed staff assistance to file grievances. In March 2015, Grievance Officer Oakley reviewed the grievance and found it moot, as Hildreth, at that point, was already receiving increased law library access and assistance with his grievances when necessary (Doc. 46-9).

On July 9, 2015, Hildreth's extra library access was rescinded because he was assigned an ADA attendant to help him write grievances and pleadings (Doc. 83-3). Hildreth went back to attending the law library about once every other week (Doc. 83-1, pp. 45-49). According to Hildreth, the attendant did not have his GED, couldn't spell, and his writing was nearly as sloppy as Hildreth's. Using the attendant is "not even worth it." (*Id.*, p. 85). The current ADA Coordinator, Angela Crain, attested that if Hildreth does not want to use the ADA attendant, "he can simply request extra library time again in lieu of the attendant and the ADA attendant will then be assigned to another inmate." (Doc. 83-3).

Hildreth testified that while he has not missed any court deadlines and has been able to file motions and complaints without a typewriter, he is only able to do a portion of what he used to do, which was spend at least six hours a day working on court filings in his cell (*Id.*, pp. 52-53). Meanwhile, other inmates are given time and supplies in their cells to draft documents, which he cannot do (*Id.*, pp. 50-51).

Hildreth stated that he sued Defendant Butler because he thinks she improperly denied him access to a typewriter (*Id.*, p. 117). He sued Defendant Oakley because she mooted his grievances, and "[s]he's the only avenue I got to raise the issues . . . And I think she hasn't done her job to help me find avenues to—to correct it." (*Id.*, p. 119).

*Hildreth's Prescription Medication*

To alleviate the symptoms of Hildreth's Parkinson's disease, a prison doctor prescribed Mirapex. According to Hildreth, Mirapex has made a "day and night" difference for him (*Id.*, pp. 89, 92). Hildreth takes Mirapex three times a day and receives his pills monthly, meaning he receives 90 pills at a time (*Id.* pp. 89-90).

Hildreth is supposed to see the doctor every six months to have his prescription renewed, but he testified that he thought the doctor sometimes automatically renewed it (*Id.*, p. 94). To refill his monthly prescription, Hildreth must turn in the refill sticker within seven days of the end of the prescription to a nurse or a medic, who then takes it to the pharmacy (*Id.*, p. 90). Hildreth usually receives his refill when he has three to five days of medication left (*Id.*, p. 91). He testified that if the medicine is not there by then, he knows he's "got problems." (*Id.*). He would tell his gallery officer, who would then instruct him to tell the nurse on duty; however, the nurses would tell him to wait and see if it comes in time (*Id.*). If the Mirapex did not come in time, then he would file a grievance (*Id.*). Hildreth testified he would begin experiencing withdrawal symptoms the second day, "if not late in the first day," without his medication (*Id.*, pp. 95-96).

According to Hildreth, his Mirapex prescription lapsed "at least three times" (*Id.*, pp. 93, 103). The longest amount of time he went without Mirapex was at least ten days. (*Id.*, p. 95). Without his medication, Hildreth experiences hot flashes, poor balance, stiffness, ticks

and shakiness, and his gait becomes shuffled. He has freezing episodes, where his body can't move, so he stays in his cell and eats food from the commissary rather than walking to chow for meals (*Id.*, p. 98).

The record contains three grievances[2] in which Hildreth complained of a lapse in receiving his Parkinson's medication. Hildreth testified that he wrote a grievance dated April 8, 2014, stating he was out of his Parkinson's medication again. The grievance was determined by the Warden to be an emergency (Doc. 83-1, p. 72). The Warden responded that the Healthcare Unit said Hildreth was seen on the doctor call line on April 9, 2014, and that his medication was renewed for one year (*Id.*). Hildreth explained that while his prescription may have been renewed on that date, he would not have received it that day. Rather, it would have been ordered on April 9 to be received later (*Id.*, p. 73).

Hildreth wrote a second grievance regarding his Mirapex prescription on October 25, 2014 (*Id.*, p. 76). Within this grievance, Hildreth stated he was about to run out of his prescription for Mirapex, which can cause adverse side effects (Doc. 46-6). Hildreth testified he probably had two or three days' worth of medication left when he wrote the grievance (Doc. 83-1, p. 100). The Warden expedited this grievance as an emergency (Doc. 46-6). The Grievance Officer then contacted the Healthcare Unit, which stated that Hildreth received his Mirapex on October 30, 2014 (Doc. 83-1, p. 76).

Hildreth's third grievance is dated November 16, 2015 (Doc. 43-4). Hildreth wrote that he had been out of his Parkinson's medication since November 13 (*Id.*). The Warden determined that this grievance would be handled on an expedited basis, and the Grievance Officer responded on November 23, 2015, finding the grievance moot (Doc. 43-5). The

---

[2] Hildreth testified he wrote a grievance each time he was out of his medicine (*Id.*, p. 94).

Healthcare Unit Administrator had advised the Grievance Officer that Hildreth's non-formulary prescription had expired and the request to continue using Mirapex was sent to the pharmacy (*Id.*). The Healthcare Unit was "waiting to hear back." (*Id.*). The Warden concurred in the decision on November 25, 2015 (*Id.*). The record is silent as to when Hildreth received his prescription.

Hildreth also supplied the Court with an affidavit from Michael McGowan, a fellow inmate at Menard who lived in the same gallery as Hildreth. McGowan attests that he overheard conversations between Hildreth and who he believed to be Wexford nurses on two occasions (Doc. 84-3). The contents of these conversations are inadmissible hearsay, however, and may not be relied upon to defeat summary judgment. *See* FED. R. EVID. 802; FED. R. CIV. P. 56(c)(4); *Maddox v. Jones,* 370 F. App'x 716, 720 (7th Cir. 2010) (citing *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible hearsay cannot be used to overcome a properly supported motion for summary judgment). Thus, the Court will not consider this affidavit.

*Prescription Refill Process*

Wexford contracts with the IDOC to provide certain medical services to IDOC prison facilities including Menard (Doc. 34, ¶ 21). Dr. Roderick Matticks, Wexford's Lead Regional Medical Director in Illinois, testified that Wexford's site medical director would oversee the treatment of Hildreth's Parkinson's disease, including his prescription medication, while Wexford's nursing staff would oversee delivery of the medication (*Id.*, pp. 4-5). Boswell Pharmacy, which is not owned by Wexford, is responsible for filling prescriptions written for inmates at Menard (Doc. 80-2, p. 8).

Dr. Matticks further testified to the prescription medication process at Menard. Once

a Wexford doctor writes a prescription, a nurse reviews the order, signs off on it, and submits it to the pharmacy department (*Id.*, pp. 6-7). The pharmacy technician then sends the prescription to Boswell to have the medication filled (*Id.*, p. 7). Dr. Matticks explained the prescription is generally transmitted to Boswell within a few hours so that it can be filled and returned to Menard the following day to up to two days later (*Id.*, p. 13). Once Boswell returns the medication to the Healthcare Unit, it is generally dispensed to the patient within a day by either Wexford or IDOC-employed nurses (*Id.*, pp. 7, 17-18). When a patient needs a refill, he is instructed to turn in the refill sticker within seven days of the end of the prescription packet to a nurse or the Healthcare Unit (*Id.*, p. 19). The patient is responsible for turning in his own refill sticker (*Id.*).

Dr. Matticks also explained the difference between formulary and non-formulary prescriptions (*Id.*, p. 9). While formulary medications are available without any prior approval, non-formulary medications require a prescription along with an explanation of what medications have been tried in the past, the doses tried, how long they were tried, and why the non-formulary medicine is necessary versus medication that is currently on the formulary (*Id.*, pp. 9-10). That information is sent to Boswell, where clinical pharmacists review the information and have the option of approving the medication at that time or sending the prescription back for further information and clarification (*Id.*, p. 10). Mirapex was a non-formulary medication, meaning it was not kept in stock at Menard but rather had to be filled by Boswell (*Id.*, pp. 10-11).

As to Hildreth specifically, Dr. Matticks testified that he was aware of two or three instances where Hildreth "had some perceived delays in obtaining refills on his medications, and those have occurred around—a couple of those that I recall occurred around the time

that the chronic clinics would have occurred . . . They were about six months apart. And it appears he did not make it to the chronic clinic . . . and so did not see the physician. So at that time, you know . . . that's when the time lapse could have occurred." (*Id.*, pp. 14-15).

## THE REPORT AND RECOMMENDATION

Defendants Butler and Oakley filed a motion for summary judgment as to Hildreth's ADA claim, in which they argue that Hildreth's constitutional rights were not violated when reasonable accommodations were provided to him. Defendants also argue they are entitled to qualified immunity and that Defendant Butler lacks any personal involvement after April 2014 when she became Warden and was no longer the ADA coordinator.

Wexford also filed a motion for summary judgment as to Hildreth's delayed medical attention claim, in which it makes three primary arguments. First, Wexford argues Hildreth's *Monell* claim must fail because he has not shown any Wexford employee was deliberately indifferent to his serious medical needs. In other words, because there is no underlying deliberate indifference claim against a Wexford employee, Hildreth cannot demonstrate that any Wexford custom or policy caused the individual to act with deliberate indifference. Second, Wexford argues that there is no evidence its official policies are unconstitutional and were the motivating force behind any alleged constitutional violation. Finally, Wexford argues Hildreth has not put forth sufficient evidence to infer a widespread custom or practice was the direct cause of Hildreth not receiving his Mirapex prescription on time. Wexford asserts that Hildreth's medication was late only three times, which is not enough to infer a custom or practice of deliberate indifference by Wexford, especially when IDOC employees and Boswell Pharmacy could have caused or contributed to the delay.

In the Report and Recommendation, Magistrate Judge Wilkerson concluded that

Defendants Butler and Oakley were not entitled to summary judgment because a question of fact existed as to whether the accommodations provided to Hildreth were reasonable. Magistrate Judge Wilkerson noted that Hildreth's increased access to the law library ended at some point, and now Hildreth only has access once every other week. Furthermore, the assistance he received from his counselor was limited, and the "legal assistant" they assigned to him is another inmate who lacks a GED, spells poorly, and has illegible handwriting. Finally, Magistrate Judge Wilkerson concluded Defendants Butler and Oakley are not entitled to qualified immunity.

With regard to Wexford, Magistrate Judge Wilkerson first rejected the argument that because there are no deliberate indifference claims pending against any Wexford employees, there can be no valid policy or practice claim against Wexford. Magistrate Judge Wilkerson then concluded that the Court need not determine the number of incidents required to show a custom or practice because the number of times Hildreth's Mirapex arrived late is a contested issue of material fact. Nevertheless, Magistrate Judge Wilkerson then concludes that there was a minimum of five incidents in which Hildreth did not receive his medication on time, and a jury could infer from these five incidents that there existed a pattern or custom of not filling his prescriptions on time.

Wexford objected to the Report and Recommendation on three grounds. First, Magistrate Judge Wilkerson omitted facts regarding the prescription refill process, including how an inmate requests and then obtains a refill of his medication. Second, Wexford argues the facts are insufficient to support a finding that it has a *widespread* custom or practice that proximately caused Hildreth's injuries when there is no evidence other inmates were affected or that only Wexford employees caused the alleged untimely refills. Third, Wexford

objects to Magistrate Judge Wilkerson's conclusion that an underlying constitutional violation by an individual is not a necessary prerequisite for a *Monell* claim.

Defendants Butler and Oakley did not object to the Report and Recommendation.

## LEGAL STANDARD

Where timely objections are filed, this Court must undertake a *de novo* review of the Report and Recommendation. 28 U.S.C. § 636(b)(1)(B), (C); FED. R. CIV. P. 72(b); SDIL-LR 73.1(b); *Harper v. City of Chicago Heights*, 824 F. Supp. 786, 788 (N.D. Ill. 1993); *see also Govas v. Chalmers*, 965 F.2d 298, 301 (7th Cir. 1992). If no objection is made, the Court reviews the Report and Recommendation only for clear error. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999). In reviewing the Report and Recommendation, the Court must look at all of the evidence contained in the record and give fresh consideration to those issues to which specific objections have been made. *Id.* (quoting 12 Charles Alan Wright et al., *Federal Practice and Procedure* § 3076.8, at p. 55 (1st ed. 1973) (1992 Pocket Part)). The Court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Because Defendant Wexford has objected to the Report and Recommendation as it applies to Wexford, the Court must review that portion of the analysis *de novo*. Because Defendants Butler and Oakley did not object, however, the portion of the Report and Recommendation pertaining to them will be reviewed only for clear error.

### Summary Judgment

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes*

*Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

In responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

## DISCUSSION

### A. Deliberate Indifference as to Wexford Health Sources, Inc.

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, a plaintiff must show first that his condition was "objectively, sufficiently serious" and second that the "prison officials acted with a sufficiently culpable state of mind," namely, deliberate

indifference. *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted).

"Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987).

While Wexford is a private corporation, under Seventh Circuit law, a private company that has contracted to provide essential government services, such as health care for prisoners, can be held liable if the constitutional violation was caused by an unconstitutional policy, practice, or custom of the corporation itself. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014); *see also Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978).

In this case, Hildreth does not point to an official Wexford policy that is allegedly unconstitutional. Instead, he claims Wexford has a widespread practice or custom of failing to deliver prescription refills on time. To demonstrate that Wexford is liable for a harmful custom or practice, Hildreth must present evidence that (1) the prescription refill process is an unconstitutional practice and (2) the practice is widespread, that is, "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 790 (7th Cir. 2006)); *Grieveson v. Anderson*, 538 F.3d 763, 773 (7th Cir. 2008).

The Seventh Circuit has not adopted any bright-line rule defining "a widespread custom or practice," except that the conduct must occur more than once "or even three" times to impose *Monell* liability. *Id.* "[T]he plaintiff must demonstrate that there is a policy at issue rather than a random event. This may take the form of an implicit policy or a gap in expressed policies . . . or a series of violations to lay the premise of deliberate indifference." *Id.* (citation omitted). As explained by the Court of Appeals, "[t]his requires more than a showing of one or two missteps." *Id.* Rather, the Court must determine whether a trier of fact could find "systemic and gross deficiencies" in the defendant's procedures. *Id.* Even then, a *Monell* claim can only prevail if policymakers knew of the deficiencies and failed to correct them. *Id.*; *see also Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).

For the purposes of summary judgment, Wexford does not dispute that Hildreth suffers from an objectively serious medical need. Accordingly, the Court assumes without deciding that Hildreth's Parkinson's disease was a serious medical need. The issue at hand is whether Wexford was deliberately indifferent to that need due to some unconstitutional practice or custom.

The Court first notes while the Report and Recommendation states there are at least five instances in the record where Hildreth did not receive his medication on time, it appears there are only three documented instances. Hildreth filed grievances relating to his medicine on April 8, 2014, October 25, 2014, and November 16, 2015. Hildreth's October 30, 2014 grievance actually complains of the need for staff assistance in writing grievances related to his medication refills, not about the refills themselves (Doc. 46-8). Further, the notation on January 15, 2016, in Hildreth's grievance history, referred to by Magistrate Judge Wilkerson, appears to refer to the ARB's return of his November 16, 2015 grievance (Docs 43-3, 43-4).

That leaves, as summary judgment evidence, Hildreth's testimony that he filed a grievance any time his medication did not arrive on time, three grievances—filed over the span of a year and a half—complaining that he did not get his medicine on time, and his testimony that his Mirapex arrived late at least three times.[3] On two of those occasions, the record indicates Hildreth received his medication within a couple of days of his prescription lapsing (and there is no evidence as to when he submitted his refill sticker on those two occasions). The third time, the Healthcare Unit advised that Hildreth's prescription had expired, and the request to continue using Mirapex was sent to the pharmacy. Dr. Matticks explained that Mirapex is a non-formulary medication, meaning it is not kept in stock at Menard but rather has to be filled by Boswell Pharmacy after approval by the pharmacy's clinical pharmacists. Dr. Matticks further testified that at least one of Hildreth's lapses occurred around the chronic clinics, which Hildreth apparently did not attend, thereby causing the delay. Hildreth has presented no evidence that any other inmates were affected by this alleged unconstitutional practice.

The Seventh Circuit has held that while "it is not impossible for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence limited to his experience . . . it is necessarily more difficult . . . because what is needed is evidence that there is a true municipal policy at issue, not a random event. *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (citations omitted). In *Grieveson*, the Court found that four incidents in which jail guards gave the plaintiff his entire prescription at once, thereby exposing him to the risk of having his medication stolen by other inmates, was not evidence of a widespread practice or reflective of a policy choice by the defendant. *Id.* The Court explained

---

[3] Hildreth's April 8, 2014 grievance does complain he is out of his medicine "again." When asked whether the number of times his medicine was delayed was less than ten times, Hildreth responded, "could be."

that evidence of four incidents that the plaintiff alone experienced "simply is not enough to foster a genuine issue of material fact that the practice was widespread—from that evidence alone an inference does not arise that the *county itself* approved, acquiesced, or encouraged the disbursement of entire prescriptions at once." *Id.* at 774-75.

Hildreth argues in his summary judgment response that *Grieveson* is distinguishable because, in that case, the plaintiff was complaining about a deviance from an actual written policy, whereas here there is no evidence of a written policy that instructs Wexford's employees how to act in a constitutional manner. Thus, Hildreth argues, whether Wexford's policy of "condon[ing] whatever practices its employees develop" is constitutional is a question for the jury. This argument fails for two reasons. First, the portion of *Grieveson* cited to by Hildreth was discussing the plaintiff's challenge to the prison's grievance procedure, which is irrelevant to this case. Second, Dr. Matticks testified to Wexford's policies related to prescription medications. Dr. Matticks was not at all uncertain as to how prescription medication is dispensed at Menard, nor was he only describing the process by "vague references to the customs and practices of its employees." These are not questions of fact for a jury.

The Court instead finds *Grieveson* quite on point with this case. Hildreth has evidence of only three instances over the span of a year and a half in which his own medication was delayed. Based on this record, there is not enough evidence for a reasonable jury to find that Wexford encouraged a widespread practice of failing to timely refill prescriptions. Therefore, Wexford is entitled to summary judgment.

### B. ADA Claim as to Defendants Butler and Oakley

Title II of the ADA provides that "no qualified individual with a disability shall,

because of that disability . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2006). "In the prison context, a plaintiff can make out a prima facie case of discrimination under both the ADA . . . by showing: (1) he is a qualified person; (2) with a disability; (3) the Department of Corrections denied him access to a program or activity because of his disability or otherwise subjected him to discrimination; and (4) the denial or discrimination was by reason of his disability." *Farris v. Kurr*, No. 16-CV-272-SMY-RJD, 2018 WL 3036130, at *3 (S.D. Ill. June 19, 2018) (citing *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012)).

Failure to make reasonable accommodations to ensure participation in the public entity's programs or services by a person with a disability qualifies as "discrimination." 42 U.S.C. § 12112(b)(5)(A). Evaluating the reasonableness of a particular accommodation in the prison context is particularly fact-intensive and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff. *Golden v. Illinois Dep't of Corr.*, No. 12-CV-7743, 2016 WL 5373056, at *4 (N.D. Ill. Sept. 26, 2016) (citing *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001); *Holmes v. Godinez*, 311 F.R.D. 177, 226 (N.D. Ill. 2015)). "Security concerns, safety concerns, and administrative exigencies [are] important considerations to take into account." *Id.* (citing *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996)). The key question is whether the inmate was able to participate in the activities in question, given his disability, with or without reasonable accommodations from the prison. *Love*, 103 F.3d at 560.

As discussed above, Magistrate Judge Wilkerson found Defendants Butler and Oakley were not entitled to summary judgment because a question of fact existed as to

whether the accommodations provided to Hildreth were reasonable. Magistrate Judge Wilkerson noted that Hildreth's increased access to the law library ended at some point, and now Hildreth only has access once every other week. Furthermore, the assistance he received from his counselor was limited, and the "legal assistant" Defendants assigned to him is another inmate who lacks a GED, spells poorly, and has illegible handwriting.

When considering the prison's safety and security concerns (Menard is a maximum-security prison), as well as the fact that Hildreth has been able to draft legal documents and other correspondence, the Court finds that the accommodations provided are reasonable as a matter of law. From August 2013 to July 9, 2015, Hildreth was able to attend the law library and access a typewriter three times a week for six hours a day. He also could contact an officer in emergency situations, and a counselor was available to assist him.[4] The increased access to the law library was only rescinded when Hildreth was assigned a personal ADA attendant to write for him. While Hildreth complains the attendant cannot spell and has sloppy handwriting, he also admits he has not missed any deadlines or had any court filings returned as a result. Thus, with the accommodations made available to him, Hildreth is able to write documents. Finally, while Hildreth complains about the skills of his attendant, the Report and Recommendation overlooks the affidavit from the current ADA Coordinator, Angela Crain, who attested that if Hildreth does not want to use the ADA attendant, "he can simply request extra library time again in lieu of the attendant and the ADA attendant will then be assigned to another inmate." (Doc. 83-3).

Because these accommodations are reasonable as a matter of law, the Report and

---

[4] The counselor was available from July 2, 2012 to September 12, 2012. At that time, it was determined Hildreth could write on his own and did not require a counselor's assistance. Hildreth was advised, however, that emergency staff assistance was still available anytime (Doc. 46-13).

Recommendation is clearly erroneous in recommending that summary judgment be denied as to Defendants Butler and Oakley.

CONCLUSION

For these reasons, the Court respectfully **REJECTS** the Report and Recommendation (Doc. 90) and **GRANTS** the motion for summary judgment filed by Wexford Health Sources, Inc. (Doc. 79) and the motion for summary judgment filed by Defendants Kim Butler and Lori Oakley (Doc. 82). This action is **DISMISSED**, and the Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:   July 17, 2018**

**NANCY J. ROSENSTENGEL**
**United States District Judge**